SCVAWCR-Doe v Archdiocese of N.Y. (2024 NY Slip Op 50330(U))

[*1]

SCVAWCR-Doe v Archdiocese of N.Y.

2024 NY Slip Op 50330(U)

Decided on March 27, 2024

Supreme Court, Westchester County

Gonzalez, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on March 27, 2024
Supreme Court, Westchester County

SCVAWCR-Doe, Plaintiff,

against
Archdiocese of New York, and ST. JOSEPH'S SEMINARY, Defendants.

Index No. 52418/2021

LEAHEY & JOHNSON, P.C. 
Attorneys for Defendants
ARCHDIOCESE OF NEW YORK and 

ST. JOSEPH'S SEMINARY AND COLLEGE s/h/a ST. JOSEPH'S SEMINARY
120 Wall Street, Suite 2220
New York, New York 10005
(212) 269-7308 
BY: Christopher Delamere Clarke
MEAGHER & MEAGHER, P.C. 
Attorney for Plaintiff
111 Church Street 
White Plains, New York 10601 
(914) 328-884
By: Matthew S. Martin, Esq. 

Doris M. Gonzalez, J.

Upon the submission of the following:
PAPERS NUMBERED
Notice of Motion (Seq. #3), Opposition, Reply 4587
Factual Background
[*2]Overview
This is one of the formerly time-barred cases arising out of sexual misconduct against a child revived by the Child Victim's Act. The alleged wrongdoer was Thomas Reis,[FN1]
a close friend of plaintiff's family. The complaint alleges that from 1983 to 1989, when plaintiff was approximately 10 to 16 years old, Reis, while he worked on the grounds of St. Joseph's Seminary (hereinafter, "St. Joseph's" or "the seminary"), sexually abused him, as well as at Reis' apartment and at the family residence. The first occurrence took place at the family's residence located on the grounds of the seminary, while Reis was babysitting the plaintiff and his brother. Through the ensuing years the molestation occurred in various buildings located at the seminary. The complaint seeks damages from St. Joseph's and the Archdiocese of New York (hereinafter, "Archdiocese").
Plaintiff's mother [FN2]
testified at her examination before trial that she knew Reis since she was a child. Plaintiff's father became friendly with Reis in the early 1970's when he and Reis played on the same baseball team. In 1983, plaintiff's father was hired as the Director of Maintenance and Grounds [FN3]
at defendant St. Joseph's Seminary (hereinafter, St. Joseph's),[FN4]
and as a benefit of employment, plaintiff and his family moved into a residence located on the grounds of St. Joseph's. As Director of Maintenance and Grounds, plaintiff's father hired Reis as a maintenance worker.
Allegations in the Complaint
The complaint alleges that from 1983 to 1989, when plaintiff was approximately 10 to 16 years old, Reis was an employee of both St. Joseph's and the Archdiocese.[FN5]
While Reis was employed at the seminary, as alleged in the complaint, "[p]laintiff was continually seen by the Defendants with THOMAS REIS, with such frequency and in places where the Defendants should have known that Plaintiff was continuously being molested, abused, assaulted, harassed, mistreated, preyed upon and physically violated by THOMAS REIS." The complaint [*3]additionally alleges that, "[a]t all relevant times, the Archdiocese of New York created, oversaw, managed, controlled, directed and operated parishes or churches of the Archdiocese of New York, including ST. JOSEPH'S SEMINARY AND COLLEGE."[FN6]
It is alleged that defendants had actual or constructive notice that plaintiff was being sexually abused, and they failed to protect him, resulting in physical, psychological, and emotional injuries.
The first cause of action alleges negligence and "gross negligence" as to both defendants on the theory that "knowing that THOMAS REIS was looking after, caring for and tending to the minor Plaintiff . . . imposed a duty that the Defendants exercise that degree of care of a parent of ordinary prudence in comparable circumstances." The third cause of action alleges negligent hiring, supervision, and retention.[FN7]
Plaintiff seeks both compensatory and punitive damages. Defendants' answer asserts 18 affirmative defenses, including the absence of notice of the perpetrator's criminal propensities and conduct.
Evidence adduced by movants on the motion for summary judgment
Father's testimony
According to the deposition of the plaintiff's father, the seminary property extends over 40 acres, and contains six or seven buildings. Dozens of employees were hired to maintain the property. He commenced employment at the seminary in 1969 as a maintenance worker and was employed there for 43 years. During his employment at St. Joseph's, he was eventually promoted to Director of Maintenance and Grounds, which was the head position in charge of the building and maintenance department. The position included a family residence on the grounds of St. Joseph's, which the plaintiff's family occupied in 1983.
As Director, plaintiff's father supervised approximately 16 employees, including workers employed as custodial workers, maintenance, security, and "grounds men." His department provided one security guard at night to patrol the seminary. Private security guards were present at the seminary property during the day.
The deponent's paychecks were at first issued with St. Joseph's as the payor. Subsequently, EMS became his employer, and was listed on his paychecks. He could not recall the time when that change in employer occurred, but believed it was during the relevant time [*4]period herein. In addition, the maintenance, building, and grounds employees were all later employed by EMS.
In the early 1980's, plaintiff's father as Director of Buildings of Grounds interviewed Reis for a position as a maintenance worker. Prior to that time, he had never personally met Reis, although Reis was a childhood friend of his wife. Reis applied for the job on the recommendation of his wife's brother.
Reis provided a standard job application indicating that he had never been arrested. A background check was performed with no negative results. Plaintiff's father testified that he did not recall any negative employment evaluations or complaints regarding Reis's prior employers. Reis became a "close family friend." In the five years that he knew Reis prior to moving to the residence at St. Joseph's, he became his "best friend." At one point, they operated a "side business" together.
He asked Reis to babysit his sons at the St. Joseph's residence when they were going to a wedding. When they returned home, both boys were awake. Nothing appeared out of the ordinary.
Plaintiff's father observed Reis with his son on the property during work hours once or twice weekly. Based on the close relationship he had with Reis, he did not find any cause for concern. In this regard, he testified:
"You know, this guy  I worked 40 hours a week with this gentleman, all right? I did side jobs on nights and weekends. I coached Little League and basketball with this guy. I bowled, played football, and played baseball with this guy. This guy was with me more than anybody, more than I was with my wife. I trusted him with everything."
In 1995, when the plaintiff was 22 years old, he learned of Reis's sexual abuse in 1995. No one had ever complained of Reis's abuse or suspicious behavior. 
Mother's testimony
Plaintiff's mother testified that she worked at St. Joseph's. Her employment began in 1984, as a secretary for the "field education department," and then, as secretary to the Procurator, Fr. Colacicco.[FN8]
She testified Reis was allowed to babysit the plaintiff while she and her husband attended a wedding in October 1983 or 1984. Her son first revealed the abuse in 1995. She received no reports nor had any knowledge of sexual contact by Reis and her son or anyone else. During the entire time that she knew Thomas Reis, until July 1995, no one had ever made any report to her of any concerns about Thomas Reis's behavior with children. He did not behave in any manner that would indicate that he was a danger to children or had any proclivity to abuse children. As secretary to the Procurator, she was never made aware of any complaints concerning Thomas Reis.
Cleary affidavit and deposition
The deposition testimony of William Cleary states that initially, he was a student at St. Joseph's from 2000 to 2004. He left but returned in 2012 as a professor and advisor of the [*5]seminarians (students studying for priesthood). In 2020, he became Vice Rector, and in that capacity, among other things, he directly supervised the housekeeping staff, and on occasion, maintenance staff. Cleary stated that he worked under the Rector, who is the "boss" or "president" of the seminary, tasked with general oversight of all school operations. 
Cleary testified that while he was a student, he personally knew the plaintiff's farther as the Director of Maintenance and Grounds, and he also personally knew plaintiff's mother as an administrative assistant. His understanding of the role of the Director of Maintenance and Grounds was that the duties were largely the same in 2000 (when he first arrived at St. Joseph's) as they are today, in the Director supervises all of the maintenance workers and groundskeepers.
Cleary averred in his affidavit that Reis was employed by a non- party named Ecclesiastical Maintenance Service Inc. (EMS) which provided personnel to staff the grounds and buildings maintenance crews at St. Joseph's. Plaintiff's father was also employed by EMS and was Reis' direct supervisor with respect to his work at St. Joseph's. Based upon Cleary's search for records, there were no documents or records reflecting any report to St. Joseph's between 1983 and 1989 wherein plaintiff, his father or mother, or anyone else ever reported Reis engaging in improper behavior toward children.
Affidavit of Roderick Cassidy
Roderick Cassidy avers that he is the General Counsel for the Archdiocese, and as the General Counsel, serves as the chief legal officer for the Archdiocese and provides counsel on legal and corporate matters. He states that at the time of the alleged abuse, Reis was employed by non-party EMS, under the supervision of plaintiff's own father. He attests that the Archdiocese has never owned the property where the alleged acts occurred, and did not hire, supervise, train, or retain the grounds and maintenance staff at the facility or the property where the alleged acts occurred. The relevant corporate documents pertaining to St. Joseph's and the Archdiocese confirm that these three entities are separate and distinct corporations.
Plaintiff's testimony
The abuse began in 1983, when he was ten years old, after his family moved into the residence at St. Joseph's. Reis was asked by his parents to babysit both plaintiff and his brother at the family's residence on the grounds of St. Joseph's while they attended a wedding. During that evening, Reis groped plaintiff over his clothing. This was the first instance of abuse.
Thereafter, Reis observed plaintiff riding his bike on the ground of St. Joseph's. Reis asked him to come to his office, where abuse occurred. Plaintiff testified that numerous instances of abuse occurred in an unused area of the seminary, which had formerly been used as a residence for students. To access this area, it was necessary to pass through an active kitchen area. He testified that Reis "would sneak me up the staircase, past the kitchen area. . . we had to — we had to sneak by there quickly, because there was a lot of women and men working, either cleaning dishes, or making food, and walking back and forth."
Plaintiff stated that employees who might have observed him with Reis on the grounds knew him as the Director's son and knew that Reis was his father's good friend (as well as an employee). He was unaware of anyone ever witnessing the abuse. He testified that:
"We definitely snuck around. We definitely  I definitely was aware that we weren't just walking around nonchalant, like nothing's weird going on here. I was definitely scared of being caught. I was definitely aware that we were sneaking around . . . cause I was [*6]terrified of the consequences that were supposedly  I was going to receive if I did get caught . . .
That I was going to get in a lot of trouble with my parents, with the seminary, being in places I wasn't supposed to be, or that  he put a lot of emphasis on him: That he was gonna get in a lot of trouble and that he did not want that to happen..."
Reis was also plaintiff's coach, although plaintiff could not recall which sport. On one occasion, when plaintiff was 14 or 15 years old, he stayed at Reis's home to help him set up for a barbecue the next day, at which abuse occurred. Plaintiff testified that in 1989, when he turned 16, he told Reis that their "relationship" had to come to an end. Reis honored this request, and no further abuse occurred.
Plaintiff did not report the abuse to anyone until 1995, when he was 23 or 24 years old. When the plaintiff disclosed the abuse, Reis was no longer working at St. Joseph's.
Argument of the defendants
Defendants move for summary judgment dismissing the complaint. They argue that the admissible evidence demonstrates that there was no custodial relationship between defendants and plaintiff which would give rise to a duty to supervise or afford protection to the plaintiff from the criminal conduct of others. It is argued that plaintiff was not a student at an Archdiocesan school, or a participant in any Archdiocesan program. Therefore, no duty would arise to supervise and protect plaintiff from the alleged abuse by Reis.
As to plaintiff's third cause of action, defendants argue that they lacked actual or constructive notice of Reis's alleged propensity to commit child sexual abuse. Neither plaintiff's father, as Director, nor EMS had notice or knowledge of any propensity on the part of Reis to sexually abuse children. Plaintiff's mother, as secretary to the Procurator at St. Joseph's, never received a single complaint from anyone about Reis at any time during her many years at St. Joseph's. Lastly, plaintiff never reported the alleged abuse to his parents, or anyone else, during the time of the alleged abuse.
Defendants also contend that plaintiff's alleged personal encounters with Reis were not "set up" through defendants. Instead, the uncontroverted testimonial evidence, they maintain, establishes that each alleged encounter was "set up" through plaintiff's own family because of their friendship with Reis. Plaintiff, a minor who attended public school, was not a student at St. Joseph's or any archdiocesan institution at the time of the abuse. At the time of each occurrence of abuse, plaintiff was outside the custody and control of defendants. Thus, they argue that the lack of any nexus between Reis's alleged employment relationship with defendants and the alleged abuse by Reis is fatal to plaintiff's claims.
Argument of the plaintiff
Plaintiff argues in opposition that defendants overlook the facts that St. Joseph's was the plaintiff's landlord, and thus St. Joseph's owed a duty of care to plaintiff to protect him from rape and sexual assault by Reis on the premises of St. Joseph's. In this regard, plaintiff argues that St. Joseph's actionable negligence sound in premises liability. Defendants, plaintiff contends, fail to demonstrate that there are no triable issues of fact as to whether St. Joseph's had a duty of care to plaintiff arising out of the landlord-tenant relationship. A material issue of fact exists as to whether St. Joseph's, as plaintiff's family's landlord, had notice of, or could reasonably foresee, [*7]that the many unmonitored and unsecured places of concealment on its grounds might invite the sort of criminally deviant behavior to which Reis subjected the then-minor plaintiff.
Plaintiff further argues that the Archdiocese owed a separate duty of care to plaintiff by virtue of its control over EMS. Plaintiff contends that defendants fail to address the status of EMS as an Archdiocese-owned and operated entity, and therefore have not established that absence of triable issues of fact arising out of the Archdiocese's ownership and operation of EMS, Reis's employer.

Discussion
The Child Victims Act, effective February 14, 2019, revived the statute of limitations to commence civil actions against any party for physical, psychological, or other injury suffered as a result of conduct that would constitute a sexual offense under certain specified sections of the Penal Law committed against a minor (CPLR § 214-g). Prior to the passage of the Child Victims Act, New York's restrictive statute of limitations required most survivors of child sexual abuse to file civil actions long before they were psychologically able to rationally consider seeking redress for the crimes committed against them (Fletcher v State of New York, 218 AD3d 647 [2d Dept 2023]). The primary intent of the legislation was to revive civil claims by survivors of childhood sexual abuse and provide a more generous statute of limitations for such claims in the future (see Vincent Alexander, Practice Commentaries, McKinney's Cons. Laws of NY, Book 7B, CPLR § 214-g).
The fact that a claim is revived, however, does not necessarily mean that the claim is substantively meritorious. As the First Department recently observed:
"Only conduct meeting the requirements of CPLR 214-g suffices to revive causes of action asserted under the CVA. Revival, however, merely means that the statute of limitations does not bar the underlying cause of action. Revival does not establish the viability of a cause of action for CPLR 3211 (or other) purposes. That is a separate analysis, independent of whether a plaintiff has established sufficient predicate conduct permitting revival." (Doe v. Wilhelmina Models, Inc., 2024 NY App. Div. LEXIS 1052, *3 [1st Dep't 2024]).
Moreover, the Second Department has noted that "the intent of the CVA as expressed in its legislative history is to provide New York survivors of child sexual abuse an avenue to seek justice for the abuse they suffered by extending New York's restrictive statutes of limitations, recognizing the justifiable delay often associated with coming to terms with and reporting such abuse." (S.H. v. Diocese of Brooklyn, 205 AD3d 180, 194, 167 N.Y.S.3d 171, 182 [2d Dept. 2022].) The CVA is thus procedural, providing "an avenue to seek justice," which does not substantively define or revise existing causes of action. 

To obtain summary judgment, the movant is required to sufficiently establish its cause of action or defense to warrant the court as a matter of law in directing judgment in its favor (CPLR § 3212[b]). The movant "must make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to eliminate any material issues of fact from the case. Failure to make such a showing requires denial of the motion, regardless of the sufficiency of the opposing papers" (Winegrad v New York University Medical Center, 64 NY2d 851 [1985][internal citations omitted]). Once this showing has been made, the burden shifts to the party opposing the motion to produce evidence in admissible form sufficient to establish the existence of a triable issue of fact (Alvarez v Prospect Hospital, 68 NY2d 320 [1986]). "A [*8]motion for summary judgment should not be granted where the facts are in dispute, where conflicting inferences may be drawn from the evidence, or where there are issues of credibility" (Ruiz v Griffin, 71 AD3d 1112 [2d Dept 2010][internal quotations omitted]). The evidence must be viewed in a light most favorable to the nonmoving party and it should be given the benefit of all favorable inferences (Gonzalez v Metropolitan Life Ins. Co., 269 AD2d 495 [2d Dept 2000]). Speculative and conclusory assertions are insufficient to defeat summary judgment (Hartman v Mt. Valley Brew Pub, Inc., 301 AD2d 570 [2d Dept 2003]). "[A]s a general rule, a party does not carry its burden in moving for summary judgment by pointing to gaps in its opponent's proof but must affirmatively demonstrate the merit of its claim or defense" (Martinez v 1261 Realty Co., LLC, 121 AD3d 955 [2d Dept 2014]).
Defendants' alleged duty of care based on premises liability
At the outset, plaintiff failed to rebut any of the facts set forth in the sworn affidavits of Roderick Cassidy, Esq., or Monsignor William Cleary. Plaintiff does not dispute the factual evidence submitted by the defendants that the Archdiocese did not own St. Joseph's or the home where plaintiff's family resided at the time of the abuse, as demonstrated by copies of certified property deeds demonstrating that St. Joseph's was the sole owner of the Seminary. Further, the plaintiff has not refuted the defendants' proof that the Board of Regents of the State of New York granted St. Joseph's a charter in 1921 and authorized it to grant college level degrees to adults since that time. Plaintiff therefore cannot recover against the Archdiocese under a premises liability claim. Moreover, as indicated below, even if validly asserted against the Archdiocese, a premises liability claim would fail as against the Archdiocese for the same reasons that such a claim fails against St. Joseph's.
Plaintiff seeks recovery against the defendants under the first cause of action based on negligence or gross negligence. To prevail on a negligence claim, a plaintiff must demonstrate a duty owed by the defendant to plaintiff, a breach of that duty, and injury proximately resulting therefrom (Mitchell v Icolari, 108 AD3d 600 [2d Dept 2013]). The existence of a legally recognized duty is a threshold issue before the court (Gilson v Metropolitan Opera, 5 NY3d 574 [2005]). In Gilson v Metropolitan Opera, the Court of Appeals noted its reluctance to extend the duty of care where a defendant may become liable for failure to control the conduct of others, imposing such duty "only where the defendant's relationship with either the tortfeasor or the plaintiff places the defendant in the best position to protect against the risk of harm and that the specter of limitless liability is not present" (Id.).
This Court does not dispute that the defendant St. Joseph's (but not eh Archdiocese), as landlord, was subject to a common-law duty to take minimal precautions to protect tenants from foreseeable harm, including harm from the foreseeable criminal conduct of third persons. Such claims are governed by general principles of negligence. (Scurry v. New York City Hous. Auth., 39 NY3d 443 [2023] [recovery possible even in cases of "targeted" criminal assault on premises].)[FN9]
However, "[t]his duty arises when there is an ability and an opportunity to control [*9]such conduct, and an awareness of the need to do so (see Hillen v Queens Long Is. Med. Group, P.C., 57 AD3d at 947; Jaume v Ry Mgt. Co., 2 AD3d 590, 591, 769 NYS2d 303 [2003]; Cutrone v Monarch Holding Corp., 299 AD2d 388, 389, 749 NYS2d 280 [2002])." (Kaplan v Roberts, 91 AD3d 827, 829 [2d Dept. 2012] [emphasis added].)
As stated in the seminal case by the Court of Appeals recognizing a landlord's duty to protect persons on the premises for criminal conduct:
"Of course, a possessor of land, whether he be a landowner or a leaseholder, is not an insurer of the visitor's safety. Thus, even where there is an extensive history of criminal conduct on the premises, the possessor cannot be held to a duty to take protective measures unless it is shown that he either knows or has reason to know from past experience "that there is a likelihood of conduct on the part of third persons . . . which is likely to endanger the safety of the visitor" (Restatement, Torts 2d, § 344, Comment f). Only if such conditions are met may the possessor of land be obliged to "take precautions . . . and to provide a reasonably sufficient number of servants to afford a reasonable protection" (id.)." (Nallan v. Helmsley-Spear, Inc., 50 NY2d 507, 519, 407 N.E.2d 451, 429 N.Y.S.2d 606 [1980].)
The owner therefore has a duty to take minimal security measures. "In determining whether to impose liability for negligence for the failure to warn of the possibility of criminal attack or the failure to take other measures to reduce the likelihood of criminal attacks, the courts have relied upon such factors as the overall pattern of criminal activity occurring in the general vicinity of the defendant's premises as well as the frequency of criminal activity on the defendant's premises. The principal hurdles for plaintiffs in this type of action involve the issues of foreseeability and causation" (1 LexisNexis AnswerGuide New York Negligence § 3.07 [2023].)
The duty of a defendant in a premises liability case will also depend on foreseeability. Whether a plaintiff will be permitted to recover in a specific case will ordinarily turn on the foreseeability of the crime, in addition to the existence of a duty and proximate cause. (See, e.g., Waldon v. Little Flower Children's Service, 1 NY3d 612, 776 N.Y.S.2d 532, 533, 808 N.E.2d 852 [2004] [stabbing of a foster parent by foster child's biological mother as she was leaving defendant's premises was not foreseeable where the attacker had no history of violence and had not threatened agency staff or the foster parent in the past).
In Miller v. State (62 NY2d 506, 467 N.E.2d 493, 478 N.Y.S.2d 829 [1984]), a junior at the State University of New York (SUNY) at Stony Brook, was accosted by a knife-wielding assailant in the laundry room of her dormitory at approximately 6:00 a.m., blindfolded, and lead to a dormitory room where she was raped. In finding that the failure to maintain locked doors was actionable, the Court of Appeals stated, "a landlord has a duty to maintain minimal security measures, related to a specific building itself, in the face of foreseeable criminal intrusion upon tenants. . . defendant here had a duty to take the rather minimal security measure of keeping the dormitory doors locked when it had notice of the likelihood of criminal intrusions." (Miller v. State, 62 NY2d 506, 513 [emphasis added].) In Miller, the evidence of prior criminality included [*10]evidence strangers frequented the hallways and other areas, men had been present in the women's bathroom, and the school newspaper had published accounts of numerous crimes in the dormitories including armed robbery, burglaries, criminal trespass, and a rape by a nonstudent. (Miller v. State, 62 NY2d 506, 509.)
Foreseeability of criminal conduct was also addressed by the Court of Appeals in Jacqueline S. v. City of New York (81 NY2d 288, 614 N.E.2d 723, 598 N.Y.S.2d 160 [1993]), in which a child victim was abducted in the lobby of a building, taken to the roof, and raped. In addressing whether the assault was foreseeable, the Court of Appeals held that neither the "exact location" where or "the same type of criminal conduct" need have occurred in the past. The Court stated: 
"Turning to defendant's common-law duty, we reject the argument that plaintiff's allegations are insufficient to raise a triable issue as to the foreseeability of the violent assault on plaintiff merely because the housing police could not recall whether the violent criminal activity known to have occurred in the Wagner Houses took place inside the specific Wagner House structure where plaintiff resided. We have never adopted the restrictive rule urged by defendant and apparently embraced by the Appellate Division: that to establish the foreseeable danger from criminal activity necessary for liability, the operative proof must be limited to crimes actually occurring in the specific building where the attack took place . . .
"There is no requirement in Nallan or Miller that the past experience relied on to establish foreseeability be of criminal activity at the exact location where plaintiff was harmed or that it be of the same type of criminal conduct to which plaintiff was subjected. Indeed, in Miller, the occurrence of criminal activity in plaintiff's college dormitory was held to be foreseeable, in part, because of different criminal conduct occurring in other dormitories on the same campus (see, Miller, supra, at 509). Whether knowledge of criminal activities occurring at various points within a unified public housing complex, such as Wagner Houses, can be sufficient to make injury to a person in one of the buildings foreseeable, must depend on the location, nature and extent of those previous criminal activities and their similarity, proximity or other relationship to the crime in question."
(Jacqueline S. v. City of New York, 81 NY2d at 294-295; see Ward v. Pyramid Co., 11 AD3d 1012 [4th Dept. 2004] [where plaintiff's infant son was sexually assaulted in a mall bathroom, prior police reports involving sexual assaults on defendants' premises, including in the bathrooms, raised an issue of fact whether defendants knew or should have known of the probability of criminal conduct on the part of third persons against mall visitors]).
In stark contrast to the foregoing cases, here, there is no allegation or evidence of prior conduct which would suggest that the conduct at issue was foreseeable. There is no allegation that St. Joseph's had any knowledge of any criminal conduct on the premises, or any knowledge of any risk of sexual assault to persons lawfully on the premises. The mere fact that the campus of the seminary contained numerous rooms, closets, and other areas which could be used to commit a sexual assault did not establish notice of a foreseeable risk of such conduct.
Neither St. Joseph's nor the Archdiocese assumed a duty to give further protection to the plaintiff. "A person not a parent who undertakes a duty to care for or supervise a child is required to use reasonable care to protect the child from harm and may be liable for injury proximately [*11]caused by his or her negligence in doing so, particularly since the standard of care owed a child is higher than that required for an adult" (Mary A. ZZ. v Blasen, 284 AD2d 773, 775, 726 NYS2d 767 [ed Dept. 2001] [citations omitted].) Neither defendant undertook to supervise the plaintiff. It was in fact plaintiff's father who supervised Reis, and he had no basis to believe that Reis was abusing his son. As the defendants argue, the plaintiff was not a student to whom a heightened duty was owed. Moreover, "there is no duty imposed upon a landlord to supervise children who are properly upon its premises." (Moseley v Philip Howard Apts. Tenants Corp., 134 AD3d 785, 787 [2d Dept. 2015] [no duty to supervise infant injured using playground equipment].)
The Court is mindful that in the context of a premises liability matters involving children, foreseeability and preventative measures are ordinarily questions of fact. (Demarest v. Village of Greenwich, 2024 NY App. Div. LEXIS 1124, *3-4 [3d Dept. 2024].). Here, however, the inferences based on the undisputed facts present only the conclusion that the risk to the infant plaintiff was not foreseeable.[FN10]

Negligent Selection, Retention, Supervision and Training of Employees
"An employer can be held liable under theories of negligent hiring, retention and supervision where the complaint alleges that the employer knew or should have known of the employee's propensity for the conduct which caused the injury" (Novak v Sisters of the Heart of Mary, 210 AD3d 1104 [2d Dept 2022; Fuller v Family Servs. of Westchester, Inc., 209 AD3d 983 [2d Dept 2022]; Navaeh T. v City of New York, 132 AD3d 840 [2d Dept 2015]). Actual or constructive notice to defendant of prior similar conduct is generally required (see Navaeh T. v City of New York, supra.)
" 'To state a claim for negligent hiring, retention or supervision under New York law, a plaintiff must plead, in addition to the elements required for a claim of negligence: (1) the existence of an employee-employer relationship; (2) "that the employer knew or should have known of the employee's propensity for the conduct which caused the injury' (Kenneth R. v. Roman Catholic Diocese of Brooklyn, 229 AD2d 159, 161, 654 N.Y.S.2d 791 [2d Dept. 1997])." (John Doe v. Educational Inst. Oholei Torah, 2023 NY Misc. LEXIS 14666, *8-9, 2023 NY Slip Op 33946(U), 7 [Sup. Ct., Kings Co.].) 
The essential element of an employer-employee relationship is lacking in this case. As indicated above, both plaintiff's father and Reis were employed by EMS. The uncontested testimonial evidence demonstrates that Reis worked with plaintiff's father and both of them were employed by non-party EMS from 1975 to 1990. The plaintiff has not established how either the Archdiocese or St. Joseph's was liable for the alleged negligent supervision of Reis when he was [*12]employed by non-party EMS. The record is devoid on any contractual agreements indicating the relationship of EMS to either of the named defendants. On this basis alone the claim for negligent supervision must fail.
Moreover, as demonstrated below, any such claim is without merit on the additional and independent ground that plaintiff cannot demonstrate that "the employer knew or should have known of the employee's propensity for the conduct which caused the injury" (Fuller v Family Servs. of Westchester, Inc., 209 AD3d 983 [2d Dept 2022]). As stated in Sheila C. v Povich [11 AD3d 120, 129 [1st Dept 2004]):
"The negligence of the employer in such a case is direct, not vicarious, and arises from its having placed the employee in a position to cause foreseeable harm, harm which the injured party most probably would have been spared had the employer taken reasonable care in making its decision concerning the hiring and retention of the employee."
Here, the uncontroverted evidence is that a background check was performed when hiring Reis, and it is not disputed that he had no prior incidents, accusations, or even suspicion of abusing children. There is no indication that a more thorough check would have uncovered any propensity on the part of Reis to molest minors, and any suggestion in this regard is based on pure speculation. (K.I. v New York City Bd. of Educ., 256 AD2d 189, 189-192 [1st Dept 1998] [dismissing negligent hiring claim where no evidence existed that background check would have uncovered any misconduct].) Therefore, there is no evidence of negligence in hiring Reis.
The salient issue in this action is whether the defendants had notice or knowledge of Reis's propensity for criminal sexual conduct, or of facts from which a reasonable suspicion of such conduct could be inferred. In Nouel v. 325 Wadsworth Realty LLC (112 AD3d 493 [1st Dept. 2013], leave to appeal denied 23 NY3d 904 [June 5, 2014]), plaintiff infant and her mother brought an action against, inter alia, a building superintendent and the owner of the building, to recover damages for sexual battery that took place in the basement of their apartment building which was committed by the superintendent, a registered sex offender. In affirming the dismissal of the negligent hiring, retention, and supervision claims, the First Department observed that record lacked any indication that defendants had knowledge of the employee's propensity for criminal sexual conduct. The fact that the superintendent had constructed a children's' playroom in the basement did not give notice, as the superintendent had children of his own residing at the premises.
As in Nouel (supra), the record here contains no evidence, and the plaintiff does not allege the existence of any, of information from which a trier of fact could infer the defendants knew or should have known of Reis's propensity to commit sexual abuse. The defendants' submissions, which include the testimony of both parents, demonstrate their prima facie entitlement to judgment as a matter of law, as there is no evidence in the record that the defendants knew or should have known of Reis's propensity to commit sexual abuse.
The sole evidence that exists on this record as to the possibility that the defendants should have known that Reis posed a danger to plaintiff was that the plaintiff was seen near or with Reis during work hours in and around the seminary buildings. By the father's own testimony, Reis was a family friend whom he entrusted to babysit his son on more than one occasion. Plaintiff's father, despite seeing his son with Reis on the grounds, never suspected that there was anything unusual in Reis's relationship with his son. Plaintiff's father, at his deposition, was asked, "Q. So, fair to say it was not an unusual thing to see those two [Reis and [*13]the plaintiff] together from time to time on the grounds?," to which he responded, "No. And even my younger son, too, yes." As the plaintiff himself conceded during his deposition, he was known as the son of the Director, and Reis was known to be a close friend of the plaintiff's family, suggesting, as plaintiff's father forthrightly stated, that it was "not an unusual thing."
An employer is on notice of an employee's dangerous conduct "if a reasonably prudent employer, exercising ordinary care under the circumstances, would have been aware of the employee's propensity to engage in the injury-causing conduct" (Moore Charitable Found. v PJT Partners, Inc., 40 NY3d 150, 158-159, 195 N.Y.S.3d 436, 217 N.E.3d 8 [2023]). Given the close family relationship, a reasonable employer would not suspect that plaintiff's presence with and near Reis on the grounds was a sign of potential sexual abuse. Plaintiff's farther, both as father and as Reis immediate supervisor, in exercising reasonable care, did not suspect any propensity on Reis' part to cause harm to his son, and thus notice did not exist as a matter of law.
Further, there is no indication that the plaintiff was seen entering closets, or other areas of the premises, which would alert a reasonable observer to potential sexual misconduct. Reis was able to persuade the plaintiff that it was in both of their interests not to be "caught." The inescapable inference from plaintiff's own testimony is that Reis and he were actively attempting to conceal their activities. Any suggestion that "someone must have seen something" of an alarming nature is based on pure speculation and conjecture. Indeed, plaintiff's mother lived and was employed at the seminary, and no one ever spoke to her or raised any concern that they had seen the plaintiff with Thomas Reis and that it was "suspicious or weird."
Lastly, even if the plaintiff's presence at various locations on the ground or in the buildings should have been observed, there is lacking a "nexus" between the alleged failure to supervise and the alleged negligent supervision of Reis. The requirement of a "nexus" between the negligent supervision and the harm suffered means that the employer's failure to supervise must have been the proximate cause of the injury suffered by the plaintiff. (Gonzalez v City of New York, 133 AD3d 65, 70 [1st Dept 2015] [plaintiff must demonstrate is a connection or nexus between the plaintiff's injuries and the defendant's malfeasance]; K.I. v New York City Bd. of Educ., 256 AD2d 189, 189-192 [1st Dept 1998]; Waterbury v New York City Ballet, Inc., 205 AD3d 154, 162 [1st Dept 2022] [nexus "means that the employer's negligence must be a proximate cause of the plaintiff's injury"]). For example, in Roe v Domestic & Foreign Missionary Socy. of the Prot. Episcopal Church (198 AD3d 698, 701 [2d Dept 2021]), the infant plaintiff was abducted near her home and sexually assaulted in a secluded area by an employee of the defendants. The assault did not occur on church property and had no connection to the perpetrator's employment. There was no "nexus" between the alleged negligent supervision and the assault.
Here, likewise, a "nexus" between the alleged sexual assaults and negligent supervision is lacking. Reis was able to commit the abuse, not because he was negligently supervised, but because he was given unfettered access to the plaintiff as a close personal and trusted friend of plaintiff's parents. The first abuse occurred inside the private residence where Reis had been permitted to babysit the plaintiff and his brother. Other instances of abuse occurred at Reis apartment. It was not Reis's presence at the seminary as an employee which enabled him to commit the abuse, but rather, it was his role as a family friend, and even caretaker, that allowed him access to the plaintiff. Had Reis been a stranger to the plaintiff, his presence near and with the plaintiff on seminary grounds may well been suspicious and given rise to knowledge of foreseeable harm to the infant plaintiff. It was his role as trusted family friend and caretaker that [*14]permitted the abuse to take place without raising suspicion. 
As was said in another context by the Appellate Division, "The plaintiff's plight is indeed pitiful and cries out for sympathy. Unfortunately, for [him], the law does not give [him] the legal relief [he] seeks." (Cruz v. Latin News Impacto Newspaper, 216 AD2d 50, 51, 627 N.Y.S.2d 388, 389 [1st Dept. 1995). The court is not unmindful of the plaintiff's position and the courage it took to twice bring forth these claims. But no matter how sympathetic and deserving the plaintiff is, the Court is constrained to apply the law without sympathy or prejudice. 
Any contentions of the parties not specifically addressed herein have been considered and are without merit.
Accordingly, upon due deliberation, it is hereby
ORDERED that the motion for summary judgment (NYSCEF Motion Sequence No. #3) by defendants Archdiocese of New York, and St. Joseph's Seminary is granted; and it is further
ORDERED that complaint is dismissed; and it is further
ORDERED that the County Clerk is directed to enter judgment dismissing the complaint in its entirety.
This constitutes the Decision and Order of the Court.
Dated: March 27, 2024,
White Plains, New York
E N T E R:
Hon. Doris M. Gonzalez, J.S.C.

Footnotes

Footnote 1:Thomas Reiss is not a party to this action. The plaintiff sued Thomas Reiss in 1995 in this Court based upon the same allegations of sexual abuse. That action was settled although not formally discontinued.

Footnote 2:This opinion refers to "plaintiff's mother" and "plaintiff's father" so as to avoid identifying the plaintiff.

Footnote 3:Initially, plaintiff's father was employed directly by St. Joseph's. Later, as explained infra, he and the other grounds and maintenance workers became employees of non-party Ecclesiastical Maintenance Service (EMS).

Footnote 4:St. Joseph's was and is a seminary for the education of priests. There are no minor students at St. Joseph's. 

Footnote 5:The complaint does not refer to EMS.

Footnote 6:The caption herein names St. Joseph's Seminary, but the allegations of the complaint refer to St. Joseph's Seminary and College.

Footnote 7:By stipulation dated August 10, 2021, plaintiff withdrew the Second, Fourth, Fifth, Sixth, Seventh and Eighth causes of action, with prejudice. See NYSCEF Doc. No. 27. The Second cause of action alleged "breach of duty of care in loco parentis," in that the defendants "breached their duty of in loco parentis by leaving THOMAS REIS alone and unsupervised with the Plaintiff knowing that he posed a clear and present danger to him. It is alleged that defendants had a duty to train employees and agents in the prevention of sexual abuse and to implement policies and procedures for the prevention of sexual abuse (Id. at 7, 8-9, 11). The Fourth cause of action alleged respondeat superior; the Fifth, deliberate indifference; the Sixth, negligent infliction of emotional distress; the Seventh, reckless indifference; and the Eighth, compliance with the Child Victims Act.
Footnote 8:She testified that the Procurator served directly under the Rector of St. Joseph's, and that the Rector was the President of the Seminary.

Footnote 9:In other CVA cases, it has been held that premises liability claims are subsumed within claims for negligent hiring and retention. See Fay v. Troy City Sch. Dist., 197 AD3d 1423, 1424 (3d Dept. 2021), in which the plaintiff was allegedly sexually assaulted by a physical education teacher and a swim coach employed by the school district. The Third Department held that the causes of action for premises liability and negligent infliction of emotional distress fell entirely within the scope of plaintiff's separate causes of action for negligence, negligent supervision, and negligent retention.

Footnote 10:See also, Nouel v. 325 Wadsworth Realty LLC (112 AD3d 493 [1st Dept. 2013], leave to appeal denied 23 NY3d 904 [June 5, 2014]), discussed infra, where the court held, as to the theory of sexual assault based on premises liability by landlord's employee, that given defendants' lack of notice, plaintiffs' premises liability negligence claim was properly dismissed, and further, that "although couched as a premises liability claim, [it] is merely duplicative of the negligent hiring, retention, and supervision claims. (Nouel v. 325 Wadsworth Realty LLC, supra, 112 AD3d at 494.)